IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WANDA COLLIER,<br><br>       Plaintiff,<br><br>       v.<br><br>TURNER INDUSTRIES GROUP, L.L.C., a Louisiana limited liability company; DAVID EASTRIDGE; NU-WEST INDUSTRIES, INC., a Delaware corporation, d/b/a Agrium Conda Phosphate Industries, and JACK DANIELL, an individual,<br><br>       Defendants. | Case No.  4:CV 09-596-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it motions for summary judgment filed by the defendants. The Court heard oral argument on June 7, 2011, and took the motions under advisement. For the reasons explained below, the Court will grant the motions in part, dismissing the claims for (1) intentional infliction of emotional distress, (2) violation of the Idaho Human Rights Act, (3) breach of contract, (4) breach of the implied duty of good faith and fair dealing, (5) promissory estoppel, and (6) punitive damages on the state law claims.  In addition, the Court will narrow the Title VII hostile work environment claim to a single-incident claim based on the pushing incident occurring on September 10, 2008. In all other respects, the motions shall be denied.

# FACTUAL BACKGROUND

Plaintiff Wanda Collier claims she was harassed at her job and ultimately fired because she was a woman. She has sued her employer, Turner Industries Group, and her supervisor, David Eastridge. She has also sued the company that retained Turner to do maintenance work, Agrium Conda Phosphate Industries, and its Maintenance Superintendent, Jack Daniell. She brings claims for gender discrimination under § 1983, Title VII, and their Idaho state-law counterparts, along with additional state law claims such as battery and intentional infliction of emotional distress.

Agrium owns a fertilizer plant located in Soda Springs, Idaho. To maintain the plant, Agrium entered into a two-year agreement with Turner whereby Turner would provide maintenance services and labor. Defendant Jack Daniell, Agrium's Maintenance Superintendent, helped select Turner as the maintenance contractor. Plaintiff Collier worked for Turner as the site safety representative.

Collier's direct supervisor was Fred Keller, Turner's site manager. Keller in turn reported to David Eastridge, Turner's project manager. Eastridge had helped negotiate Turner's agreement with Agrium and Daniell. After the agreement was signed, Eastridge continued to work with Daniell to "ensure that [Agrium's] needs [were] taken care of." *See Eastridge Deposition (Vol. I)* at p. 19. Because Eastridge was often traveling to other sites, Daniell frequently dealt with Fred Keller.

The agreement stated that Turner was an independent contractor. Under the agreement, Agrium would tell Turner what maintenance work it wanted done on the plant

and the number of man-hours Turner could devote to the project, and Turner would recommend to Agrium how many Turner employees should work on that particular project. When Agrium approved, Turner would begin the project.

Collier began work with Turner in April of 2008, as an at-will employee. She was responsible for going into the field, observing and training workers, writing inspection and incident reports, and correcting any unsafe behaviors.

In June of 2008, Collier was involved in an incident with Turner employee Doug Taylor over co-worker Kathie Ledger's failure to open a "tool crib" on time. When Taylor heard Collier questioning Ledger about the late opening, Taylor – according to Collier – screamed profanities at Collier, including "she will fucking go to the tool crib when she fucking gets there." *See Collier Deposition* at p. 81.

There were also two incidents where Daniell observed employees using or handling materials improperly – one involving aerosol cans and the other involving face shields. On both occasions, Daniell berated Collier and demanded that she provide proper training for these employees. Another incident arose when Daniell spoke with Collier regarding general housekeeping issues around the plant, as employees on a weekend shift had left trash strewn about the plant. Collier described Daniell as intimidating and testified that he treated her in a "mean and nasty" manner. *See Collier Deposition* at p. 193.

On August 4th, 2008, Eastridge met with Daniell and discussed Collier's job performance. *See Eastridge Deposition (Vol. II)* at p. 133. On the same day, immediately

after that meeting, Eastridge met with Fred Keller and Collier to discuss complaints made by Daniell regarding her job performance as well as the "tool crib" incident. *Id.*

At this meeting, Collier described the tool crib incident to Eastridge. *See Collier Deposition* at p. 111. According to Collier, Eastridge responded that "Jack [Daniell] has a gender issue with you." *Id.* Collier's testimony is confirmed by Keller who recalled that Eastridge stated that "Jack Daniell was harder on her due to the fact that she was a woman" and that Daniell was "old school." *See Keller Deposition* at pp. 43-44, 77. Collier also recalls that "Eastridge used the phrase 'old school' when discussing Jack's attitude toward my role in the workplace." *See Collier Affidavit (Dkt. 34-2)* at p. 2, ¶ 2. In addition, Collier testified that Eastridge directed her to supply additional reports to Daniell because "[w]e have to make Jack happy." *See Collier Deposition* at p. 112.

In response to Eastridge's comments that Daniell had a problem with her gender, Collier recalls "I looked at [Eastridge] sitting in that chair and I said he can't do that. It doesn't matter. Male, female, black, white, it doesn't matter. I said it's a bunch of bullshit and you need to fix that problem." *Id.* at pp. 111-12. Accepting Collier's account as true – as the Court must do in this summary judgment proceeding – she was complaining about Daniell's gender discrimination to her supervisor, Eastridge, and demanding that it stop.[1]

---

[1] At oral argument, Turner's counsel argued that Collier's affidavit testimony conflicted with her deposition testimony. More specifically, counsel contrasted Collier's statement in her affidavit that Daniell's conduct was "at least partially motivated by the fact that I was a woman," *see Collier Affidavit* at p. 3, with her deposition testimony that "I don't know what he's motivated by." *See Collier Deposition* at p. 195. However, the latter statement was made in response to a question, "do you have any evidence

Eastridge had been trained to take complaints of gender discrimination "seriously" and investigate them immediately. *See Eastridge Deposition* at p. 75. He took Collier's complaint "very seriously," investigated the "tool-crib" incident immediately, and concluded that the dispute was based on factors other than gender. *Id.* at p. 96. In addition to investigating Collier's complaint, Eastridge spoke with Daniell about the August 4, 2008, meeting. *See Eastridge Deposition* at p. 134.

About a month later, on September 10, 2008, Daniell confronted Collier about unsafe practices he had observed. A different contractor had dropped a cement pillar through the roof of the building and a barrier was erected to keep employees away from the unsafe site. Daniell had apparently seen Turner employees crossing over the safety barrier. According to Collier, Daniell confronted her, pushing her so that she was up against the wall where "[t]here was no escaping" and "no getting away from him." *See Collier Deposition* at p. 197. The front of his body touched the front of hers. *Id.* This incident is often referred to in the briefing as the "belly-bump" incident, but Collier testified that Daniell "didn't bump [me]. He pushed me." *Id.* Collier describes Daniell as "very angry," and he berated her for three to four minutes over the unsafe conduct of Turner employees in disregarding the safety barrier. *Id.*

that Jack's response or conduct during that particular incident [the housekeeping incident where trash was strewn about the plant] was in any way motivated by your gender?" *Id.* Collier's response – that she did not know what he was motivated by – appears limited to the housekeeping incident and cannot be read to exonerate Daniell of all the other incidents that Collier found offensive. Indeed, just a few minutes later in the deposition, Collier testifies that "I think he [Daniell] had an issue with my gender." *Id.* at p. 202. Granting all inferences to Collier, her deposition testimony was consistent with her affidavit. The Court therefore rejects counsel's argument that there is a material variance between Collier's affidavit and her deposition testimony.

Collier reported this incident immediately to Fred Keller. *Id.* at p. 199. Keller recalls that Collier was "visibly upset" and that she was "borderline hysterical; she was red in the face . . . she was mad, she was on the verge of crying . . . ." *See Keller Deposition* at pp. 52-53. After the pushing incident, Collier would avoid Daniell and she "kept Fred [Keller] close to me at all times." *See Collier Deposition* at p. 104.

A little over a month later, on October 27, 2008, Collier was notified that her position was to be eliminated as part of a Reduction in Force ("RIF") to take place on December 1, 2008. John Tippets, Agrium's Human Resources Officer, recalled that when he called Eastridge to discuss Collier on October 28, 2008, Eastridge said he was "concerned that we [Agrium] were put to the trouble of having to deal with the issue," and that he "felt like it would be appropriate to terminate her [Collier's] employment" immediately instead of waiting to December 1, 2008. *See Tippets Deposition* at pp. 89-91.

On October 30, 2008, Collier contacted an Agrium HR representative to file a formal complaint against Daniell. She also contacted Turner's Ethics and Compliance Hotline the following day. In both instances, she reported gender discrimination, the tool-crib incident, the comments made at the August 4th, 2008 meeting with Eastridge, and the RIF. She also filed a report with Turner and Agrium against Daniell for the September 10th, 2008, pushing incident. Agrium immediately pursued an investigation of Collier's claims, and concluded that her firing was not related to her gender.

Turner offered Collier (1) a safety coordinator position at a facility in Kentucky,

and (2) an opportunity to perform turnarounds at Agrium and other sites at a higher pay rate than she was receiving. Collier rejected both offers.

On November 24, 2008, Collier filed identical complaints with the EEOC and the Louisiana Human Rights Commission against Turner and Agrium. In her EEOC complaint, she alleged that she was the victim of sex discrimination and had been "verbally harassed and subjected to a hostile work environment by Jack Daniell . . . ." *See Exhibit 14 to Collier Deposition*. She has never filed any claim with the Idaho Human Rights Commission.

On September 3, 2009, the EEOC issued a "right to sue" letter to Collier. Collier filed this suit on November 19, 2009 claiming gender discrimination, retaliation, breach of contract, breach of implied duty of good faith and fair dealing and in the alternative, promissory estoppel, battery, intentional infliction of emotional distress, and interference with contractual relations. Collier also seeks attorney fees, punitive damages and a jury trial.

The defendants have filed motions for summary judgment. The Court will analyze the motions after reviewing the legal standards governing summary judgment

## LEGAL STANDARDS

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going

to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists.

*Celotex,* 477 U.S. at 324.

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed.R.Civ.P. 56(e). In determining admissibility for summary judgment purposes, it is the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay).

In order to preserve a hearsay objection, "a party must either move to strike the affidavit or otherwise lodge an objection with the district court." *Pfingston v. Ronan Engineering Co.,* 284 F.3d 999, 1003 (9th Cir. 2002).

## ANALYSIS

### Evidence Issues

A critical issue in this summary judgment proceeding is whether Eastridge's opinions of Daniell – that Daniell is "old school" and has issues with Collier's gender – are admissible in these proceedings. The analysis of the summary judgment motions differs considerably depending on whether the Court may consider this evidence. Therefore, the Court will begin by analyzing the evidentiary issues raised by these allegations.

**Memorandum Decision & Order - 9**

**Eastridge's Opinion of Daniell Offered Against Eastridge and Turner**

To the extent Eastridge's opinions of Daniell are offered against Eastridge and Tuner, the opinions are not hearsay under Rule 801(d)(2)(D) because they are a statement by an employee made within the scope of his employment and during that employment. For these reasons, the Court rejects the argument of Eastridge and Turner that the opinions are inadmissible hearsay as against them.

**Eastridge's Opinion of Daniell Offered Against Daniell and Agrium**

To the extent Eastridge's opinions of Daniell are offered against Daniell and Agrium, they are out-of-court statements offered to prove the truth of the matter stated – that is, that Daniell actually was "old school" and had an issue with Collier's gender. Hence, the opinions would be hearsay under Rule 801(c) unless they can be deemed non-hearsay under subsection (d).

The statements are in the form of Eastridge's opinions about Daniell rather than statements attributed by Eastridge to Daniell. Thus, the opinions do not fall under Rule 801(d)(2)(D) as statements of Agrium's employee Daniell. However, they may still fall within that Rule if Eastridge is an "agent or servant" of Agrium. Since Eastridge was not an employee of Agrium, the Court will focus on whether he was an agent of Agrium.

Eastridge's employer, Turner, was identified as an independent contractor in the contract Turner signed with Agrium. That relationship by itself does not prevent the formation of an agency relationship for the purposes of Rule 801(d)(2)(D). *See U.S. v. Bonds*, 608 F.3d 495 (9th Cir. 2010). The factors to be considered include the following:

(1) the control exerted by the employer, (2) whether the one employed is engaged in a distinct occupation, (3) whether the work is normally done under the supervision of an employer, (4) the skill required, (5) whether the employer supplies tools and instrumentalities, (6) the length of time employed, (7) whether payment is by time or by the job, (8) whether the work is in the regular business of the employer, (9) the subjective intent of the parties, and (10) whether the employer is or is not in business. *Id.* at 504. The "essential ingredient . . . is the extent of control exercised by the employer." *Id.* at 505. In *Bonds*, the Court rejected application of Rule 801(d)(2)(D) because there was no evidence the purported principal "directed or controlled any of [the purported agent's] activities." *Id.*

Here, there is evidence that Agrium and Daniell directed the activities of Turner and Eastridge. Daniell had helped select Turner and negotiated its contract with Eastridge. As the Maintenance Superintendent at the Soda Springs plant, Daniell was ultimately responsible for Turner's maintenance work. Eastridge was Daniell's liaison, and it was Eastridge's duty to meet the needs of Daniell and Agrium. Consistent with that, Eastridge told Collier that they had to keep Daniell happy. Eastridge's desire to please Agrium comes through in his apology to Tippets that Agrium had to deal with Collier's claims and in his expressed desire to RIF her immediately rather than wait for the scheduled RIF date of December 1, 2008. It was Daniell's desire to cut costs that led Eastridge to conduct the RIF.

Daniell was not a distant manager leaving all decisions up to Eastridge. Daniell

spoke directly with Collier over the incidents described above and demanded that she train employees on specific safety practices. According to Collier, Daniell intimidated her and treated her in a mean and nasty manner. Daniell talked with Eastridge about Collier's job performance immediately prior to the August 4, 2008, meeting, and later talked about the meeting with Eastridge. Daniell inquired of Keller ten to twelve times in 2008 about Collier's job performance.

This is evidence that Daniell was personally scrutinizing Collier's job performance, discussing it regularly with Eastridge, and treating Collier in a mean and nasty manner. This shows that Daniell had a motive to include Collier in the RIF; his opportunity to do so came from the fact that he negotiated Turner's contract with Eastridge and was ultimately responsible for the maintenance work at the plant, thereby holding significant influence over Eastridge.

While there is contrary evidence, all inferences are granted in favor of Collier in this summary judgment proceeding. With this standard in mind, the Court finds that there is sufficient evidence that Agrium directed or controlled Turner and Eastridge in the RIF so that Eastridge was an agent for Agrium for purposes of Rule 801(d)(2)(D).

This means only that Eastridge's opinion of Daniell is admissible for purposes of this summary judgment proceeding, and does not mean the opinion is admissible at trial. *Morgan v Doran*, 2009 WL 119802 (9th Cir. Jan. 15, 2009) (unpublished opinion). This evidentiary ruling was made under the more lenient standards applicable to Collier as the non-movant in a summary judgment proceeding – those lenient standards do not apply to

Collier at trial. *Id.* Thus, to admit the statements at trial, Collier will need to put on testimony and admit documents laying a foundation supporting a finding of agency.

Eastridge's opinion of Daniell is not admissible in these proceedings against Daniell and Agrium simply because it passes as non-hearsay; it has other hurdles to satisfy such as relevance and personal knowledge. *See Advisory Committee Notes to Rule 803* (stating that overcoming hearsay objection does not result in admission; all other exclusionary rules apply and may require exclusion of the evidence). For example, Rule 401 requires relevance. Here, Eastridge's opinions of Daniell are relevant because they make it more probable that Daniell used his influence over Eastridge to have Collier included in the RIF because she was a woman. Hence, the opinion passes Rule 401's test.

Second, the opinion must be based on personal knowledge. Rule 602 requires that the witness have personal knowledge before he can testify to anything. In addition, Rule 701 requires that for any lay opinion, the witness must base that opinion on personal knowledge. If Eastridge took the witness stand to testify to his opinion, he would have to satisfy Rule 602 and 701. The requirement is the same for out-of-court declarants. *See* 9 Wright, Graham, Gold and Graham, *Federal Practice & Procedure*, § 6338 at pp. 178-79 (1st ed. 2010) (stating that "[g]iven that one of the functions of the hearsay rule is to bolster the requirement of personal knowledge, it is not surprising that courts have found it "incongruous" to admit hearsay opinions that the witness would not be allowed to give from the witness stand."). In concluding that Rule 602 applies to hearsay declarants, the Advisory Committee stated that "[i]n a hearsay situation, the declarant is, of course, a

witness, and neither this rule [Rule 803] nor Rule 804 dispenses with the requirement of first-hand knowledge. It may appear from his statement or be inferable from the circumstances." *See Advisory Committee Notes to Rule 803*. Given that the out-of-court declarant is deemed to be a "witness," the provisions of Rule 602 and 701 – that apply on their face to "a witness"– would apply to an out-of-court declarant like Eastridge.

Here, the personal knowledge requirement is satisfied. Eastridge was Daniell's liaison with Turner during the negotiation of the "nuts and bolts" of Turner's contract, *See Eastridge Deposition (Vol. 1)* at p. 29. Once the contract was signed, Daniell and Eastridge spoke on a monthly basis through 2008, *see Daniell Deposition* at pp. 103-04, because it was part of Eastridge's duties to ensure that he and Turner were meeting the needs of Daniell and Agrium. *See Eastridge Deposition (Vol. I)* at p. 19. Immediately before making his comments about Daniell, Eastridge had met with Daniell and discussed Collier's performance on the job. *See Eastridge Deposition (Vol. II)* at pp. 116-120.

This association between Eastridge and Daniell would appear to give Eastridge insight into how Daniell felt about female employees in general and Collier in particular. That is sufficient to satisfy Rules 602's requirement that Eastridge have "personal knowledge" of Daniell's opinion of Collier, and is also sufficient to satisfy Rule 701's requirement that the opinion be "rationally based on the perception of [Eastridge]." The other requirements of Rule 701 for admission of an opinion by a lay witness are also satisfied because the opinions are (1) helpful to a clear understanding of facts at issue and (2) not based on scientific, technical or other specialized knowledge within the scope of

Rule 702.

Finally, the Court wrestled with the issue under Rule 403 as to whether the probative value of the opinions is substantially outweighed by the danger of unfair prejudice. Undoubtedly, there is a danger of prejudice to Daniell and Agrium. Because the opinions were not accompanied by any specific foundation as to how and when they were formed, Daniell and Agrium will be hamstrung on cross-examination. The prejudice is mitigated somewhat by the undisputed association between Daniell and Eastridge, discussed above, that provides a general foundation for Eastridge's knowledge of Daniell. Further diluting the prejudice is Eastridge's denial that he made such statements, giving Daniell a potent argument that Collier and Keller should not be believed. At the same time, the probative value of the opinions is high because they related directly to a central issue in this case – whether Daniell used his influence with Eastridge to include Collier in the RIF because she was a woman. While the issue is certainly a close one, the Court finds, after weighing the probative value against the danger of unfair prejudice, that Rule 403 does not block admission of these opinions in this summary judgment proceeding.

## Conclusion on Evidentiary Analysis

The Court finds that Eastridge's opinions of Daniell – that he is "old school" and has issues with Collier's gender – are admissible against all defendants in these summary judgment proceedings. Once again, the conclusions that the foundations for admission have been satisfied under Rules 401, 403, 602, and 701 were made under the summary

judgment standard that all inferences are granted in Collier's favor. Hence these conclusions have no precedential value at trial. There, Collier must lay the foundation through admissible testimony and/or documents satisfying these Rules of Evidence.

**Title VII Claim Against Turner & Eastridge – Exhaustion**

Turner and Eastridge argue first that Collier failed to exhaust her claims of discriminatory firing and retaliation because she made no such allegations in her EEOC Charge. Collier filed her EEOC Charge herself, without the assistance of counsel. While she did not allege that she was fired or retaliated against based on her gender, she did allege that she was "verbally harassed and subjected to a hostile work environment by Jack Daniel [sic], Maintenance Superintendent for Agrium CPO." *See Exhibit 14 to Collier Deposition*. She also stated that "I believe I have been discriminated against because of my sex, female, in violation of Title VII . . . in that I was told by David Eastridge, Turner Industries Project Manager, that Jack Daniel [sic] has a problem with my gender." *Id.*

The EEOC Charge must be construed "with utmost liberality since they are made by those unschooled in the technicalities of formal pleading." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir.2002). If the claim "could reasonably be expected to grow out of" the claims expressly made in the Charge, the claim should be considered. *Id.* Reading Collier's EEOC Charge liberally, the Court concludes that claims of gender - based discharge and retaliation could be expected to grow out of the allegations expressly made in the Charge. The Court therefore rejects defendants' failure-to-exhaust argument.

## Title VII Claim Against Turner & Eastridge – Discriminatory Discharge

Turner argues next that Collier has not produced sufficient evidence of discriminatory discharge under Title VII. To prevail on this claim, Collier must show (1) that she was discharged by Turner, and (2) that her gender was a motivating factor in Turner's decision to discharge her. *See Desert Palace, Inc. v. Costa,* 539 U.S. 90, 98-102 (2003); *Ninth Circuit Model Civil Jury Instructions § 10.1C.* An employer may be held liable under Title VII even if it had a legitimate reason for its employment decision, as long as an illegitimate reason was a motivating factor in the decision. *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1041 (9th Cir. 2005). "[V]ery little evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Nicholson v. Hyannis Air Service, Inc*, 580 F.3d 1116, 1127 (9th Cir. 2009).

Here, as discussed above, Collier has presented evidence that Daniell was old school and had a gender issue with Collier. This is direct evidence of discriminatory animus on the part of Daniell. *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1221(9th Cir. 1998) (labeling as direct evidence of gender discrimination opinion of decision-maker that he "did not want to deal with another female"). While defendants argue that Eastridge did not make those statements about Daniell's opinions, and that Daniell did not hold such opinions, those are questions of fact on these matters given Collier's testimony.

But Daniell's motivations are irrelevant unless they were a motivating factor in Eastridge's decision to include Collier in the RIF. There are questions of fact on this

issue.  The Court has already discussed at length the evidence that (1) Daniell negotiated

Turner's contract with Eastridge and had significant influence over Eastridge, (2)

Eastridge's duties included meeting the needs of Daniell and keeping him happy, and (3)

Daniell personally scrutinized Collier's job performance, discussed it regularly with

Eastridge and Keller, and treated Collier in a mean and nasty manner.  When this

evidence is  combined with Collier's assertions that Daniell was old school and had a

gender issue with her, they raise a genuine issue whether Daniell had a gender bias that

was a motivating factor in Eastridge's decision to include Collier in the RIF.[2]

Given this, the Court will deny Turner and Eastridge's motion for summary

judgment on Collier's claim that she was fired for being a woman in violation of Title

VII.

### Title VII Claim Against Turner & Eastridge – Retaliation

Collier claims that she was fired because she complained about Daniell's gender-

based discrimination.  To make out a claim of retaliation, Collier must show that she

suffered an adverse employment action because she opposed a practice of her employer

made unlawful by Title VII or participated in an EEOC Charge or investigation.  42

---

[2]  This analysis also refutes defendants' argument that Daniell's opinions fall with the "stray remarks" line of cases as a matter of law.  *Clark County School District v. Breeden*, 532 U.S. 268, 271 (2001) (holding that "offhand comments, and isolated incidents (unless extremely serious)" do not amount to discrimination).  Under those cases, stray remarks not acted upon or communicated to a decision-maker are not actionable.  *See Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005).  Given the issues of fact discussed above, the Court cannot find as a matter of law that Daniell's opinions are mere stray remarks.

U.S.C. § 2000e-3(a). In order to be a protected activity, the plaintiff's opposition must have been directed toward a discriminatory act by an employer or an agent of an employer. *EEOC v. Crown Zellerbach Corp*., 720 F.2d 1008, 1013–14 (9th Cir.1983) (employee's objections to discriminatory practices by the warehouse personnel manager constituted objections to discriminatory actions of the employer). The plaintiff need not show that retaliation was the sole motive for the adverse action so long as it was a motivating factor. *Stegall v. Citadel Broadcasting, Co*., 350 F.3d 1061 (9th Cir. 2003).

In this case, as discussed in detail above, one reasonable inference from the record is that Collier complained about Daniell's gender discrimination at the August 4, 2008, meeting with Eastridge. Her complaint is a protected activity under Title VII and was directed at her employer, as required. Less than three months later she was notified that she was included in the RIF. That temporal proximity is some evidence that Collier's complaint – her protected activity – was a motivating factor in her termination. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that period of three months between complaint and adverse action was sufficiently close in time to raise questions of fact whether complaint caused adverse action).

Given these circumstances, the Court finds that questions of fact exist on Collier's retaliation claim, and will therefore deny summary judgment on that claim.

**Title VII Claim Against Daniell & Agrium**

Daniell and Agrium argue that Title VII applies only to an "employer" and that they did not employ Collier. They recognize that an employee could have "joint

employers" if each entity "control[s] the terms an conditions of employment of the employee." *See EEOC v. Pacific Maritime Ass'n*, 351 F.3d 1270 (9th Cir. 2003). An entity could be deemed to be a joint employer when it "interferes with an individual's employment opportunities with another employer." *Gomez v. Alexian Bros. Hosp. of San Jose*, 698 F.2d 1019, 1021 (9th Cir.1983) (per curiam). Title VII provides protection not to an "employee" but rather to a "person aggrieved," and "that term can certainly be taken as comprehending individuals who do not stand in a direct employment relationship with an employer." *Gomez*, 698 F.2d at 1021 (quoting *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1341 (D.C.Cir.1973).

In *Gomez*, a hospital allegedly refused, on racial grounds, to hire a Hispanic physician who sought employment as an independent contractor with the hospital. In *Sibley*, a hospital allegedly blocked private nurses, on gender grounds, from working for patients in the hospital. In both cases, the Title VII claims were allowed to go forward against the hospitals even though the hospitals did not employ the plaintiffs. In both cases, the courts noted the perverse result if an employer was allowed "to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so" with its own employees. *Gomez*, 698 F.2d at 1021 (quoting *Sibley*, 488 F.3d at 1341).

Here, Collier alleges that Daniell and Agrium interfered on gender grounds with her employment with Turner, an independent contractor working for Agrium. She alleges that Daniell influenced Eastridge to include Collier in the RIF because Collier was a

woman.  The Court has held that questions of fact exist on these issues, and hence the

Court cannot find, as a matter of law, that Agrium and Turner were not joint employers of

Collier for Title VII purposes.

## Hostile Work Environment Claim Against Turner and Agrium

To survive summary judgment on her hostile work environment claim, Collier

must raise genuine issues of material fact that (1) she was subjected to verbal or physical

harassment due to her gender, (2) the harassment was unwelcome, and (3) the harassment

was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment

and create an abusive work environment.  *See Kortan v. California Youth Authority*, 217

F.3d 1104, 1110 (9th Cir. 2000*).*  Collier must show that the conduct at issue was both

objectively and subjectively offensive: she must show that a reasonable person would find

the work environment to be "hostile or abusive," and that she in fact did perceive it to be

so.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662

(1998).  Where an employee is allegedly harassed by co-workers, the employer may be

liable if it knows or should know of the harassment but fails to take steps "reasonably

calculated to end the harassment."  *Dawson v. Entek Intern*., 630 F.3d 928, 937-38 (9th

Cir. 2011).

Defendants argue that the conduct giving rise to this claim must be sexual in

nature, and they argue that none of the incidents cited by Collier involved any sexually

explicit conduct.  The Circuit has often used the phrase "sexual in nature" in listing the

elements of a hostile work environment claim.  *Dawson*, 630 F.3d at 937-38 (stating that

plaintiff may establish hostile work environment claim by showing, among other things "harassment that was sexual in nature").  However, the Circuit has made it clear that while conduct including sexually-explicit words or acts is one way to prove hostile work environment, it is not the only way – the ultimate issue is whether an employee is subjected to hostile conduct based on gender.  *See EEOC v. National Educ. Ass'n, Alaska*, 422 F.3d 840, 844-45 (9th Cir. 2005).  Thus the lack of any sexually explicit behavior is not fatal to Collier's claim.

Portions of Collier's claim nevertheless fail for another reason:  Some of the incidents she describes do not, as a matter of law, constitute a hostile work environment. With regard to Daniell's demands that Collier train employees on the disposal of aerosol cans and the use of face shield incidents, Collier concedes that both incidents were safety issues within her responsibilities as site safety representative.  *See Collier Deposition* at p. 95 (when asked if the aerosol training would have been a safety issue, Collier responded "[c]orrect"); p. 97 (when asked if it was reasonable to demand proper use of face sheilds, Collier responded "[y]es").  Daniell's anger over the houskeeping incident was directed at both male and female employees, according to Collier's own testimony.  *Id.* at p. 99 (when asked if Daniell "was requesting you, as well as other males . . . to address this housekeeping issue," Collier responded "[y]es").

With regard to the "tool crib" incident, Doug Taylor overheard Collier reprimanding Kathie Ledger for not opening the tool crib, and Taylor started shouting profanities at Collier because he was having an affair with Ledger, according to Collier.

*See Collier Deposition* at p. 82.  Taylor's hostile conduct toward Collier was therefore not gender-based.  Moreover, Eastridge immediately investigated Collier's complaint about Taylor's treatment of her, and concluded that Taylor's conduct was not gender based.  This incident happened in June of 2008, *id*. at p. 89, and for the next four months that Collier worked there, she never reported any gender-based harassing conduct – or any offensive conduct whatsoever – from Doug Taylor.  The tool-crib incident cannot form the basis for a hostile work environment claim.

The final incident involves Daniell pushing Collier up against the wall and berating her for three or four minutes over the safety barrier issue.  This incident is clearly offensive, and there are at least questions of fact (discussed in detail above) over whether Daniell's conduct was based on Collier's gender.  The issue is whether it is sufficiently "severe or pervasive" to support a hostile work environment claim.  Although a single incident like this is not "pervasive" it could be "severe" if it was "extremely serious."  *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 271 (2001).

As discussed above, severity is judged both objectively and subjectively.  There are at least questions of fact concerning the subjective effect on Collier of the pushing incident, given Keller's testimony, discussed above, that Collier was "visibly upset" and "borderline hysterical" immediately after the incident.

Although it is an exceedingly close question, the Court finds that there are questions of fact on the objective effect as well.  The Court examines the objective effect from the perspective of the victim, in this case a woman.  *Brooks v. City of San Mateo*,

229 F.3d 917,924 (9th Cir. 2000).  In *Brooks*, the Circuit affirmed summary judgment for

the employer despite plaintiff's claim that a co-worker boxed her against a console,

forced his hand under her sweater and bra and fondled her bare breast with his hand.  *Id*.

The Circuit reasoned that

> an isolated incident of harassment by a co-worker will rarely (if ever) give rise
> to a reasonable fear that sexual harassment has become a permanent feature of
> the employment relationship. By hypothesis, the employer will have had no
> advance notice and therefore cannot have sanctioned the harassment
> beforehand. And, if the employer takes appropriate corrective action, it will
> not have ratified the conduct. In such circumstances, it becomes difficult to say
> that a reasonable victim would feel that the terms and conditions of her
> employment have changed as a result of the misconduct.

*Id*. at 924.  The result would be much different, the Circuit stated, if the offender was a

supervisor rather than a co-worker:  "[A] sexual assault by a supervisor, even on a single

occasion, may well be sufficiently severe so as to alter the conditions of employment and

give rise to a hostile work environment claim."  *See Brooks v. City of San Mateo*, 229

F.3d 917, 927 n. 9 (9th Cir. 2000).  This statement was dicta because the offender in

*Brooks* was a co-worker rather than a supervisor.

Here, Daniell was the man everyone had to "keep happy" because he helped select

Turner and negotiated its contract on behalf of Agrium.  The Court has found questions of

fact whether Daniell directed Eastridge to include Collier in the RIF, and whether Agrium

and Turner are joint employers of Collier for Title VII purposes.  Thus, Daniell falls

within *Brooks*' category of "supervisor," at least in these summary judgment proceedings.

While his assault on Collier was not sexual in nature, he did physically trap her and

subject her to three or four minutes of his rage (according to Collier's testimony), and there are questions of fact over whether his conduct was gender-based. Once again, Title VII bars gender-based discrimination and is not limited simply to banning sexual assaults. Finally, the pushing incident did change the terms of Collier's employment. She testified that after the incident she avoided Daniell and "kept Fred [Keller] close to me at all times." *See Collier Deposition* at p. 104

Nevertheless, this remains a difficult issue because so few single-incident hostile work environment claims survive summary judgment, and the ones that do involve far more serious conduct than the present case. *See Little v. Windermere Relocation, Inc*., 301 F.3d 958, 967 (9th Cir.2002) (reversing summary judgment for employer because single incident of rape of plaintiff created question of fact on hostile work environment claim), *see also*, *Berry v. Chicago Transit Authority*, 618 F.3d 688 (7th Cir. 2010) (reversing summary judgment for employer because single incident of co-worker lifting plaintiff by breasts, holding her in the air, rubbing her body against his crotch three times, and forcefully dropping her to the ground created question of fact on hostile work environment claim). While the present case does not rise to the level of these cases, Collier was, according to her testimony, physically assaulted and trapped for three or four minutes by her superior – with the front of his body touching the front of hers – and subjected to his rage. The Court must determine if a reasonable juror could conclude that a reasonable woman would find Daniell's conduct severe. The Court finds that a reasonable juror could so conclude. Finding persuasive the dicta in *Brooks* discussed

above, the Court will accordingly deny defendants' motion for summary judgment on the hostile work environment claim.

**Idaho Human Rights Claims Against Turner and Agrium**

The defendants argue that Collier's failure to file a claim with the Idaho Human Rights Commission (IHRC) bars her from asserting those claims. In response, Collier argues that by filing a claim with the Equal Employment Opportunity Commission (EEOC) she has substantially complied with the requirement of filing with the IHRC.

Idaho's statutory provision requires the filing of a complaint with the IHRC as a condition precedent to litigation. I.C. § 67-5908(2). Further, the Idaho Supreme Court has interpreted it to that effect. *Bryant v. City of Blackfoot*, 48 P.3d 636, 642 (Idaho 2002) (holding that a plaintiff's failure to file an IHRC complaint would warrant a dismissal of those claims). Collier cites no authority holding that filing a charge with the EEOC satisfies this condition precedent. The Court will accordingly grant this part of defendants' motions for summary judgment, and dismiss Collier's claim under Idaho Code §§ 67-5909, 67-5911. *See Complaint (Dkt. 1)* at ¶¶ 45, 49.

**Intentional Infliction of Emotional Distress Claims**

As against all defendants, Collier alleges that she was subjected to extreme and outrageous conduct that caused severe emotional distress. She claims Turner's perpetuation of Daniell's alleged gender discrimination is *per se* outrageous, that she lost sleep and was emotionally harmed.

After the pushing incident, Collier was, as discussed above, "visibly upset" and "borderline hysterical" according to Fred Keller.  However, Collier required no counseling, was unaffected in her performance at her subsequent job, and showed no physical manifestation from her distress.  *See Collier Deposition,* at pp. 167-68.  She also testified that, after the pushing incident, she required no time off and suffered no physical harm.  *Id.,* at pp. 201-02.

Under Idaho law, a claim of Intention Infliction of Emotional Distress (IIED) consists of severe emotional distress caused by intentional or reckless conduct which was both extreme and outrageous.  *Edmondson v. Shearer Lumber Products*, 75 P.3d 733, 740 (Id.Sup.Ct. 2003).  "Unlike the tort of negligent infliction of emotional distress, intentional infliction of emotional distress does not require injury or a physical manifestation resulting from emotional turmoil."  *Alderson v. Bonner*, 132 P.3d 1261, 1269 (Id.Ct.App. 2006).  However, the plaintiff must show both outrageous conduct and severe emotional distress.  *Hatfield v. Max Rouse & Sons Northwest*, 606 P.2d 944, 953 (Id.Sup.Ct. 1980).  The distress must be so severe that "no reasonable man could be expected to endure it."  *Davis v. Gage*, 682 P.2d 1282, 1288 (Id.Ct.App. 1984) (citations omitted.)

Idaho courts have often made decisions as a matter of law that the emotional injury was not sufficiently severe.  In *Jeremiah v. Yanke Machine Shop, Inc.*, 953 P.2d 992, 999 (Id.Sup.Ct. 1998), the Supreme Court of Idaho held that, "being seriously frustrated from enduring a hostile and abusive workplace" was insufficient.  A child's screams, fear, and

loss of sleep from seeing his mother being yelled at by another motorist after a car accident was insufficient. *Payne v. Wallace*, 32 P.3d 695, 698-99 (Id.Ct.App. 2001). Moreover, a plaintiff's testimony that they were "upset, embarrassed, angered, bothered and depressed" was insufficient. *Davis*, 682 P.2d 1288.

This Court recognizes, as Idaho courts have, that severity is generally an issue for the jury. However, under the authorities cited above, this issue may, at times, be resolved as a matter of law. Collier's claim that Eastridge's conduct was *per se* outrageous is unsupported by Idaho law which has, in fact, been persuasively interpreted to the contrary. *Ward v. Sorrento Lactalis, Inc.*, 392 F. Supp. 2d 1187, 1195 (D. Idaho 2005) (noting that a Title VII violation was not enough to satisfy an IIED claim under Idaho law). The descriptions of Collier's emotional harm, loss of sleep, and reaction to the pushing incident have, in one way or another, been found insufficient by Idaho courts. Accordingly, the Court shall grant defendants' motion to dismiss the claim for intentional infliction of emotional distress.

## Battery Claim Against Agrium

Daniell claims that even if a battery did occur, no proof of injury has been alleged and, accordingly, "resolution of the matter is a question of law for the court." *Pierson v. Brooks*, 768 P.2d 792 (Idaho Ct. App. 1989). Daniell also claims that because the Plaintiff was able to return to work the same day, and because Collier's emotional suffering was in some way related to prior events, no injury occurred. Collier responds that although she suffered no physical harm from the pushing incident she may recover

for emotional or mental suffering she endured.

Under Idaho law, a battery is an "intentional, unpermitted contact upon the person of another which is either unlawful, harmful or offensive." *Neal v. Neal*, 873 P.2d 871, 876 (Idaho 1994). Taking Collier's testimony as true, as we must, a battery occurred during the pushing incident. Keller testified that when Collier reported it to him "she was borderline hysterical; red in the face . . . she was mad, she was on the verge of crying." *Keller Deposition*, pp. 13-14. This at least establishes a genuine issue of fact over Collier's mental or emotional injuries. Agrium cites no authority that Collier cannot recover, as a matter of law, for mental or emotional injuries resulting from a battery but instead must show a physical injury. Accordingly, the Court will deny summary judgment on this issue.

## Punitive Damages

Collier's complaint contains a claim for punitive damages on both her Title VII claim and her state law claims. A Title VII plaintiff may recover punitive damages for intentional discrimination where "the complaining party demonstrates that the respondent engaged in . . . discriminatory practices with malice or with reckless indifference to . . . federally protected rights." 42 U.S.C. § 1981a(b)(1). Defendants seek to dismiss Collier's punitive damage claim solely on the ground that the claims falls along with Collier's Title VII claim. However, the Title VII claim has not fallen, and so the punitive damage claim remains. Defendants do not seek to dismiss the Title VII punitive damage claim on any other ground.

Collier's punitive damage claim for her state law causes of action is governed by Idaho Code § 6-1604.  That statute forbids pleading punitive damages in the complaint but requires instead a motion to amend once discovery has been completed.  The Court will therefore strike the punitive damage claim in the complaint to the extent it relates to Collier's state law claims, and will require Collier to bring a separate motion to amend to add that claim.

## Conceded Claims

Collier agrees to dismissal of her claims for breach of contract, breach of the implied duty of good faith and fair dealing, and promissory estoppel.  The Court will so order.

## Attorney Fees

Defendants seek the fees they incurred in briefing the claims that Collier conceded, arguing that it was clear from the beginning that those claims should not have been brought.  The Court finds the argument highly persuasive.  However, Collier's counsel is entitled to have this issue set up by a separate motion and fully briefed and argued.  Thus, the Court will not grant the attorney fees at this time.

The Court would put counsel on notice of three things in regard to this issue.  First, the defense needs to cull out only those fees incurred for the claims that were conceded and support its motion with time sheets and billings.  Second, Collier's counsel must explain why he maintained those conceded claims far past the time when they should have been withdrawn.  Third, any award of fees will run against Collier's counsel rather

than Collier.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motions for summary judgment filed by defendants (docket nos. 27 & 30) are GRANTED IN PART AND DENIED IN PART. They are granted to the extent they seek to dismiss the following claims: (1) intentional infliction of emotional distress, (2) violation of the Idaho Human Rights Act, (3) breach of contract, (4) breach of the implied duty of good faith and fair dealing, (5) promissory estoppel, and (6) punitive damages on the state law claims. In addition, the Title VII hostile work environment claim is narrowed to a single-incident claim based on the pushing incident occurring on September 10, 2008. In all other respects, the motions shall be denied.

DATED: **June 22, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge